1  Tara J. Schleicher, OSB #954021
   tschleicher@fwwlaw.com
2  Farleigh Wada Witt
   121 SW Morrison Street, Suite 600
3  Portland, Oregon 97204-3136
   Telephone: (503) 228-6044
4
        Attorneys for Dr. Roderich Bott
5

6

7

8              IN THE UNITED STATES BANKRUPTCY COURT

9                  FOR THE DISTRICT OF OREGON

10 In re                          │  Case No. 14-32565-tmb11

11 Dr. Bott, LLC,                 │

12                     Debtor.    │  DR. RODERICH BOTT'S OBJECTION TO
                                  │  APPLICATION TO EMPLOY FIELD
13                                │  JERGER, LLP AS COUNSEL FOR DEBTOR

14

15        Dr. Roderich Bott ("Bott") hereby objects to the Application to Employ Field

16 Jerger, LLP as Counsel for the Debtor (Doc. No. 23) (the "Application").  Bott is the 75% owner

17 of Dr. Bott, LLC (the "LLC" or "Debtor") and, thus, has standing to object to the Application.

18 The Application seeks entry of an order employing Joseph A. Field and Field Jerger, LLP

19 (collectively "Field") as attorneys for Debtor.  This Objection is supported by the Declarations of

20 Tara J. Schleicher and Katherine Heekin, documents on file with the court, and the points and

21 authorities below.

22        Bott and counsel for Bott hold nothing personal or professional against Field.

23 However, this objection is necessary and important because Field is solely taking direction from

24 Eric Prentice (the 25% owner of the LLC) ("Prentice") in direct contravention of the LLC's

25 Operating Agreement.  As such, he is not representing the LLC.  Rather, he is, in reality,

26 currently representing Prentice to the detriment of the LLC and its creditors.  This issue has been

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    largely briefed in Bott's Response to Petitioning Creditors' Motion for Appointment of Chapter

2    11 Trustee (Doc. No. 39). Bott will not debrief or rehash that information, but incorporates it by

3    reference herein. Below is additional information not contained in that brief.

4    **A.    Field Does Not Include Bott in Major Decisions.**

5            As set forth in previous filings, Field asserts that he is to take direction from

6    Prentice, apparently even on major decisions like the appointment of a trustee. (See e.g. Doc. 39,

7    p. 4, ll. 6 – 24). Another example is failing to include Bott in discussions regarding

8    communications from potential purchasers. It is Bott's understanding from the Petitioning

9    Creditors' counsel that there are two potential individuals or entities interested in purchasing the

10   LLC's assets. Declaration of Tara J. Schleicher ("Schleicher Dec."), ¶¶ 2-3. A sale of all or

11   substantially all of the LLC's assets is a "Major Decision" explicitly listed in the LLC's

12   Operating Agreement. As such, Field should be taking direction from Bott regarding any

13   potential asset sale. However, Bott has not received any substantive information from Field or

14   Prentice regarding the asset sale communications, even though it appears there may be such

15   communications taking place.

16           Bott learned of one of the interested purchasers from Field through a courtesy

17   copy of an e-mail Field sent to that interested purchaser. Schleicher Dec., ¶ 2. When counsel for

18   Bott asked Field for information regarding the asset sale negotiations, Field indicated that the

19   conversations had been verbal and did not provide any detail. *Id*. Bott learned of a second

20   interested purchaser from Justin Leonard. *Id*. at ¶ 3. As counsel for the Petitioning Creditors,

21   Mr. Leonard sent an email to the Petitioning Creditors and interested parties, including Dr. Bott,

22   KG, dated June 6, 2014, regarding the Debtor's Schedules and Statement of Financial Affairs,

23   which stated that he was aware of two potential interested purchasers. Schleicher Dec. ¶ 3, Ex.

24   1. Neither Field nor Prentice has provided Bott with any information regarding any other

25   communications from potential purchasers, despite the Operating Agreement's requirement that

26   Bott have control over (or, at least under Field's own previously stated interpretation of the

Page 2 of 5 -    DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP
AS COUNSEL FOR DEBTOR
P:\DOCS\DRBOTT\07047\PLDG\3IU436402.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1   Operating Agreement, be included in) "Major Decisions" like a sale of all or substantially all of

2   the LLC's assets.  As a result of Field's continued insistence on taking direction from Prentice in

3   the bankruptcy, Bott objects to Field's employment as counsel for the LLC.

4   **B.      An Updated Ethics Opinion Letter is Necessary.**

5           On behalf of the LLC, Field obtained an ethics opinion letter from Peter Jarvis

6   dated May 14, 2014, which was included in previous filings with this court, but is attached for

7   reference again as Exhibit 2 to the Schleicher Dec. filed herewith (the "Opinion Letter").  Bott's

8   state court counsel, Katherine Heekin, had previously sought and obtained advice from Jarvis'

9   partner relating to ethical issues raised by conduct of the former LLC's counsel in the state court

10  case.  Declaration of Katherine Heekin ("Heekin Dec."), ¶2.  The conflict check completed by

11  Holland & Knight when Field asked Jarvis for advice did not alert the parties to the prior advice

12  Jarvis' partner gave to Bott in the state court case.  *Id.*  To obtain any update of the Opinion

13  Letter, a request must be made to Holland & Knight jointly by Bott and Prentice.  *Id.*

14          From the "Assumed Facts" in the Opinion Letter, it appears that Field failed to

15  provide Jarvis with all of the relevant facts.  In particular, it appears Field failed to communicate

16  the following:

17          1.      On November 7, 2011, Larry Vergun, Dr. Bott's lawyer, "demand[ed] that

18  the LLC institute a legal action against Mr. Prentice to avoid a derivative action forcing the LLC

19  to do so."  (Heekin Dec. ¶ 3, Ex 1, Letter from Vergun to Postma of 11/7/11).

20          2.      On November 28, 2011, Mr. Prentice, as the LLC's Operating Manager,

21  hired attorney Bob McGaughey to represent the LLC and sue Dr. Bott as a self-interested

22  counterattack to Dr. Bott's accusations against him.  (Heekin Dec. ¶ 4, Ex 2, Email from Postma

23  to Vergun of 11/28/11).

24          3.      Mr Prentice admitted during his deposition that he worked with Bob

25  McGaughey, the LLC's lawyer, to prepare the complaint.  (Heekin Dec. ¶ 5, Ex 3, Prentice Dep

26  175:17-20 and 176:2-12).  He also admitted that he came up with the complaint against Dr. Bott

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    after Dr. Bott had accused him of violating his fiduciary duties. (*Id.,* Prentice Dep 177:23-

2    178:2.)

3            4.      Dr. Bott brought a motion for summary judgment against the LLC's claim

4    contending that the LLC's lawyers are barred by ORS 63.130(4)(h) from asserting the LLC's

5    claim for a buy-out of Dr. Bott's interest that is still pending in the state court.

6            5.      Prentice is wearing two hats, one as an individual defendant accused of

7    violating his fiduciary duty to the LLC and two as the LLC's Operating Manager and Tax

8    Matters Member. Thus, Bott contends, because Prentice wears two hats, when he communicates

9    with the LLC's lawyers, he waives the attorney-client privilege.

10           6.      The state court disqualified the LLC's lawyers because they breached their

11    duty of loyalty to the LLC.

12           7.      Thereafter, Prentice engaged Field to pursue a bankruptcy action even

13    though that type of decision is a "Major Decision" that requires Dr. Bott's consent under ¶ 4.2 of

14    the Operating Agreement. Dr. Bott objected to Prentice hiring Field. (Heekin Dec. ¶ 6, Ex 4,

15    Letter to Hon. A. Fuchs of 3/17/14).

16           Because these facts are missing from the "Assumed Facts" in the ethics opinion, it

17    is incomplete and insufficient to provide any counsel for the LLC with direction and must be

18    updated.

19           Counsel for Bott has requested that Field agree to jointly request Holland &

20    Knight for an updated Opinion Letter to which both Prentice and Bott provide background and

21    input to Jarvis. Field has not responded substantively to that request. Therefore, Bott objects to

22    Field's continued representation of the LLC in this bankruptcy proceeding because (1) the

23    Opinion Letter does not take into consideration all of the background and facts that it should; and

24    (2) Field continues to act against the current advice in the Opinion Letter by failing to include

25    Bott in Major Decisions.

26    */ / /*

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1    **<u>Conclusion</u>**

2          Counsel for Bott has verified that there is an experienced chapter 11 bankruptcy

3    attorney here in Portland who does not have a conflict and who has an interest in representing the

4    Debtor in this case.  Given that Field states that he takes direction in the case from Prentice

5    despite the Operating Agreement provisions regarding Major Decisions requiring Bott's

6    approval, Bott objects to Field's employment as attorneys for Debtor of which he is the 75%

7    owner.

8          Dated: June 12, 2014.

9                                        FARLEIGH WADA WITT

10

11                               By:/s/ Tara J. Schleicher
                                     Tara J. Schleicher, OSB #954021
12                                   (503) 228-6044
                                     tschleicher@fwwlaw.com
13                                   Of Attorneys for Dr. Roderich Bott

14

15

16

17

18

19

20

21

22

23

24

25

26

DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP
              AS COUNSEL FOR DEBTOR
              P:\DOCS\DRBOTT\07047\PLDG\3IU436402.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1   Tara J. Schleicher, OSB #954021
tschleicher@fwwlaw.com

2   Farleigh Wada Witt
121 SW Morrison Street, Suite 600

3   Portland, Oregon 97204-3136
Telephone: (503) 228-6044

4

        Attorneys for Dr. Roderich Bott

5

6

7

8            IN THE UNITED STATES BANKRUPTCY COURT

               FOR THE DISTRICT OF OREGON

9

10  In re

     Dr. Bott, LLC,

11

12                  Debtor.

13

| | |
|---|---|
| In re<br><br>Dr. Bott, LLC,<br><br>         Debtor. | Case No. 14-32565-tmb11<br><br>DECLARATION OF TARA J. SCHLEICHER IN SUPPORT OF DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR DEBTOR |

14

15        I, Tara J. Schleicher, do hereby declare as follows:

16        1.    I am one of the attorneys for Dr. Roderich Bott ("Bott"). I make this

17  declaration based upon my own personal knowledge.

18        2.    Our office learned of an interested purchaser of the Debtor's assets from

19  Joseph Field ("Field") through a courtesy copy of an e-mail Field sent to that interested

20  purchaser. When I asked Field for information regarding the asset sale negotiations, Field stated

21  that the conversations had been verbal and did not provide any detail.

22        3.    Bott learned of a second interested purchaser from Justin Leonard,

23  counsel for the Petitioning Creditors. Attached hereto as Exhibit 1 is a copy of an email Mr.

24  Leonard sent to the Petitioning Creditors and interested parties, including Dr. Bott, KG, dated

25  June 6, 2014, regarding the Debtor's Schedules and Statement of Financial Affairs, which stated

26  that he was made aware of two potential interested purchasers.

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1        4.     Attached hereto as Exhibit 2 is a copy of the ethics opinion letter from

2 Peter Jarvis to Field dated May 14, 2014.

3        I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE

4 BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE

5 FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

6        Dated: June 12, 2014.

7

8          /s/ Tara J. Schleicher
            Tara J. Schleicher, OSB #984021

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 of 2 -    DECLARATION OF TARA J. SCHLEICHER IN SUPPORT OF DR. RODERICH BOTT'S
                  OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR
                  DEBTOR
                  P:\DOCS\DRBOTT\07047\PLDG\3IU5520.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

**Diane Fallon**

| | |
|---|---|
| **From:** | Justin D. Leonard [jleonard@ml-llp.com] |
| **Sent:** | Friday, June 06, 2014 4:59 PM |
| **Subject:** | DR. BOTT - Debtor's Schedules & SOFA Filed |
| **Attachments:** | DR. BOTT - 40 - Debtor's Schedules & SOFA filed on June 6, 2014.pdf |

Petitioning Creditors & Other Interested Creditors/Counsel Requesting Informal Notice,

Attached are the Debtor's long-awaited Schedules and SOFA, filed by Mr. Prentice as directed by the Court. The schedules show mostly-unencumbered cash of $670k, A/R of $420k, equipment and vehicles nearly $300k, inventory of $1.9 million, an unknown amount/value of goodwill (which Roderich Bott claims is all his, because Dr. Bott is his name and after creating the LLC with Mr. Prentice, his German company registered "Dr. Bott" as a trademark), and potential/unresolved claims against the LLC's former counsel that was disqualified and against its members relating to the state court litigation.

According to the schedules, the assets are essentially unsecured -- assuming that Herchel Supply's $1.1 million debt is NOT secured, and that Herchel must be paid pro rata as the other creditors, as the Debtor contends.

Creditors are owed nearly $10 million. Counsel for the Debtor is currently guesstimating that creditors will receive distributions of 25-30% under an orderly liquidation scenario -- or more if the business can be sold as a going concern. This is an extremely rough prediction; it could be significantly more or less, depending on many factors. Also, I learned today that apparently at least two parties have expressed interest in buying the company as a going concern and are now kicking the tires.

While there are many questions yet to be answered, the Schedules and SOFA at least provide a good starting point. I will keep you posted as I learn more.

Regards,

Justin

- - -
**Justin D. Leonard**
Admitted in Oregon, Washington & Idaho

[x]

**McKittrick Leonard LLP** | Commercial Bankruptcy & Business Law
111 SW Columbia, Ste. 1100 | Portland, OR 97201
P 971.634.0190 | F 971.634.0250 | **D 971.634.0192**

EXHIBIT 1
Page 1 of 1

# Holland & Knight

111 S.W. Fifth Avenue | 2300 U.S. Bancorp Tower | Portland, OR 97204 | T 503.243.2300 | F 503.241.8014
Holland & Knight LLP | www.hklaw.com

Peter R. Jarvis
(503) 243-5877
peter.jarvis@hklaw.com

May 14, 2014

*Via E-mail (joe@fieldjerger.com) and First Class Mail*

Joseph A. Field
Field Jerger LLP
621 SW Morrison
Suite 1225
Portland, OR  97205

     **Re:**    **Dr. Botts LLC**

Dear Joe:

You have asked me to assume the following facts:

## I.    Assumed Facts

1.    You were hired in March 2014 to represent:  Dr. Bott, LLC (the "Company"), on insolvency and bankruptcy issues.  You were not hired to, and do not, represent any of the Company's officers, directors, agents, employees or owners.

2.    The Company is an insolvent Oregon limited liability company now in the involuntary bankruptcy gap period, meaning that an involuntary petition has been filed and an automatic stay is in place but an answer has not as yet been filed.  A copy of the Company's LLC Operating Agreement (the "Agreement") as presently in force is attached hereto.

3.    Eric Prentice ("Eric") owns 25% of the Company and is identified in ¶4.1.1 of the Agreement as the Company's "Operating Manager."  Pursuant to ¶5.5 of the Agreement, Eric was the one who hired you on behalf of the Company and to whom you have reported.

4.    Dr. Roderich Bott ("Roderich") owns the other 75%.

5.    There is pending litigation involving Eric, Roderich and the Company.  In the pending case, Roderich is adverse to the Company and derivatively, thorough the Company, adverse to Eric.

6.    Through independent counsel, Roderich has asked you for copies of all of your attorney-client materials pertaining to the Company.  Eric has directed that you not provide them.

Atlanta | Boston | Chicago | Dallas | Fort Lauderdale | Jacksonville | Lakeland | Los Angeles | Miami | New York | Northern Virginia |
Orlando | Portland | San Francisco | Tallahassee | Tampa | Washington, D.C. | West Palm Beach

EXHIBIT 2
Page 1 of 21

Joseph A. Field
May 14, 2014
Page 2

7.      Relations between Eric and Roderich, as well as their separate and independent counsel, have been and are strained.

8.      Roderich has not sought to claim any additional rights under ¶4.3 of the Agreement.

## II.      Questions Asked

Based on these assumed facts, you have asked for my legal ethics/professional responsibility perspective opinion on two subjects:

1.      Should you voluntarily provide documents or information protected by Oregon RPC 1.6 to Roderich over Eric's protest?

2.      Should you generally follow Eric's directions notwithstanding Roderich's protest?

## III.      Brief Statement of Opinions

For the reasons discussed below, my opinions are as follow:

1.      No, qualified.

2.      Yes, qualified.

## IV.      Analysis

### A.      Roderich's Demand for Confidential Client Information

Since the Company, and only the Company, is your client, your duties of confidentiality run only to the Company and not to its individual owners.  *See, e.g.,* RPC 1.6, 1.13; OEC 503.  In addition, it appears that pursuant to the Agreement, Eric and not Roderich has the right to direct your conduct as the Company's client representative.

If it were absolutely clear that Roderich is entitled to the Company's confidential client information pursuant to the Agreement and to substantive LLC law, then it would be permissible for you to provide this information to him.  In point of fact, however, it is not absolutely clear that Roderich is so entitled.  Since Eric, the Company's client representative, has directed you not to share this information with him and since you are not ethically obligated to act here at your personal peril, my advice is that you not share any such information with Roderich unless Eric authorizes you to do so or a court so directs. [1]

---

[1] With regard to the potential effect of partial disclosures by Eric, *see* OEC 511.

EXHIBIT 2
Page 2 of 21

Joseph A. Field
May 14, 2014
Page 3

**B.    Following Eric's Directions**

As you know, a lawyer cannot knowingly counsel or assist a client in illegal or fraudulent conduct.  RPC 1.2(c).  At least at times, this prohibition will also cover knowingly assisting a client in breaches of fiduciary duty owed to a third party.  Apart from such circumstances, however, you are entitled if not obligated to take direction from Eric for so long as you remain counsel for the Company.  RPC 1.2(a); RPC 1.16.

Since ¶4.2 of the Agreement provides that Major Decisions require Roderich's consent, you should not take action to implement a Major Decision to which Roderich objects.[2]  Similarly, and to the extent that the Agreement is ambiguous or unclear, you would be well advised not to take action without Roderich's consent if his consent is required under ORS 63.130.  In all other instances, however, you may follow Eric's instructions.  For example, you may file truthful and nonfrivolous responses to the involuntary bankruptcy petition as directed by Eric unless:  (i) Roderich obtains or informs you that he is in the process of obtaining a court order directing you not to do so; or (ii) following Eric's directions would involve you in illegal behavior, fraud or breaches of fiduciary duty.

**V.    Concluding Remarks**

As noted above, a lawyer who represents an entity is generally entitled to take lawful directions from the individual in lawful charge of the entity.  Nevertheless, and when the authority to act is in doubt, a lawyer may refuse to act without court direction.  Please let me know if I can provide you with any additional information or input.

Sincerely yours,

HOLLAND & KNIGHT LLP

Peter R. Jarvis

PRJ:seb
Attachment

---

[2] Although Oregon Formal Op 2005-92 permits a lawyer to advise and assist a client in breaching a contract, the right to do so probably does not allow the lawyer to assist a client in knowing breaches of fiduciary obligations or in illegal or fraudulent conduct.

EXHIBIT 2
Page 3 of 21

LIMITED **LIABILITY COMPANY**
**OPERATING AGREEMENT**

**DR BOTT LLC**
**An Oregon Limited Liability Company**


THIS OPERATING AGREEMENT is made and entered into effective April 1, 1999, by and among **Dr. Roderich Bott, and Eric W. Prentice** (collectively referred to in this agreement as the "Members:).

**SECTION 1. THE LIMITED LIABILITY COMPANY**

**1.1. Formation.** Effective April, 1, 1999 the Members form an Oregon limited liability company under the name **DR. BOTT LLC** (the "Company"), on the terms and conditions in this Operating Agreement (the "Agreement") and pursuant to the Oregon Limited Liability Company Act (the "Act"). Effective April, 1, 1999 the Members agree to cause to, be filed with the Corporation Division of the Oregon Secretary of State's office Articles of Organization for the Company. The rights and obligations of the parties are as provided in the Act except as otherwise expressly provided in this Agreement.

**1.2. Name.** The business of the Company will be conducted under the name **DR. BOTT LLC** or such other name as the Members unanimously may agree on.

**1.3. Purpose.** The Company may conduct or promote any lawful business or purpose that a partnership or corporation may conduct or promote. The primary purpose of the Company is to engage in the wholesale and retail sale of computer hardware and software products, and to engage in all activities reasonably necessary and incidental thereto.

**1.4. Office.** The Company will maintain its principal business office within Oregon at 8185 SW Alden St. Suite 5, Portland, Oregon 97223.

**1.5. Registered Agent.** C. Jeffrey Abbott is the Company's initial registered agent in Oregon and the registered office is at One World Trade Center 121 SW Salmon, Suite 1030, Portland, Oregon 97204

**1.6. Term.** The term of the Company commences on April 1, 1999 and shall be perpetual unless sooner terminated as provided in this Agreement.

**1.7. Names and Addresses of Members.** The Members' names and addresses are as follows:

<u>Name</u>        <u>Address</u>                    _____

EXHIBIT 2
Page 4 of 21

| 1 | **Dr.** Roderich Bott | Ortsstr. 37 D-07426 Unterhain Germany |
| 2 | Eric W. Prentice | 8185 SW Alden St. Suite 5, Portland, Oregon 97223 |

**1.8. Admission of Additional Members.** Except as otherwise expressly provided in this Agreement, no additional members may be admitted to the Company through issuance by the company of a new interest in the Company without the prior unanimous written consent of the Members.

## SECTION 2. CAPITAL CONTRIBUTIONS

**2.1. Initial Capital Contributions.** Each Member's respective initial capital contribution is to be made to the Company no later than the date this Agreement is executed, and their initial Capital Accounts (defined in Section 6.7) in the Company is:

| Name | Initial Capital Accounts |
|------|--------------------------|
| Dr. Roderich Bott | $45,000.00 |
| Eric W. Prentice | $15,000.00 |

**2.2. Ownership Interest.** Each Member's percentage interest in the Company (the "Ownership Interest") is:

| Name | Initial Capital Percentages |
|------|------------------------------|
| Dr. Roderich Bott | 75% |
| Eric W. Prentice | 25% |

**2.3. Additional Capital Contributions.** The Members intend that to the maximum extent possible, Company obligations are to be paid from operating cash flows and from Company borrowings, whether short term or longer term. To the extent cash flow from operations and borrowings are not sufficient to meet the obligations of the Company as they become due, then, on the prior consent of all Members, the Members will contribute to the Company proportionately to their Ownership Interests the funds necessary to meet such obligations.

**2.4. No Interest on Capital Contributions.** Members are not entitled to interest or other compensation for or on account of their capital contributions to the Company except to the extent, if any, expressly provided in this Agreement.

## SECTION 3. ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

3.1. Income and Loss Determination. The Company's taxable income or loss for each fiscal year will be determined as of the end of the fiscal year by the Company's accountants in

EXHIBIT 2
Page 5 of 21

accordance with fderal income tax accounting principles, consistently applied, using that method of accounting employed in the federal income tax informational return filed by the Company for that fiscal year.

3.2. Allocations of Income and Loss. All items of income, gain, loss, deduction, and credit will be allocated among the Members pro rata in proportion to their respective Ownership Interests.

3.3. **Distributions.** Except as provided in SECTION 8, distributions will be made to the Members pro rata in proportion to their respective Ownership Interests at times and in amounts as the Operating Manager may deem appropriate or advisable; provided, however, that if any Default Advances then remain unpaid and outstanding, distributions otherwise payable to the Defaulting Member instead will be paid to the Advancing Members in chronological order of the Default Advances made on behalf of the Defaulting Member and all accrued and unpaid interest and costs of collection are repaid in full.

3.3.1. Notwithstanding Section 3.3, no distribution may be made to any Member if, after giving effect to the distribution, in the judgment of the Operating Manager, determined as permitted in the Act, either (1) the Company would not be able to pay its debts as they become due in the ordinary course of business, or (2) the fair value of the total assets of the Company would not at least equal its total liabilities.

3.4. **Transfer of Interest by Member During Fiscal Year.** If any Member transfers all or a portion of an interest in the Company during any fiscal year of the Company consistent with the provisions of SECTION 7, by sale, exchange, transfer, assignment, gift, death, operation of law, or in any other manner, the income or deduction of the Company allocable to the membership interest so transferred will be prorated between the transferor and the transferee in accordance with the number of days during the fiscal year each owned the interest, but, unless otherwise agreed between the Member and the transferee, gains or losses recognized from the sale or conveyance of Company assets will be allocated based on a closing of the books to the Member owning the interest at the time of the sale or conveyance.

3.5. **No Right to Demand Return of Capital.** No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## SECTION 4. POWERS AND DUTIES OF MANAGERS

4.1. **Management of Company.** The management and control of the Company and its business and affairs are exclusively in the Members. The Members, or any of them, have all the

EXHIBIT 2
Page 6 of 21

powers that may be possessed by a member in a limited liability company without managers pursuant to the Act.

**4.1.1.** Notwithstanding Section 4.1, the Members agree among themselves that, except as otherwise provided in Section 4.2, in connection with Major Decisions (defined in Section 4.2), the right to manage the day-to-day operations of the Company rests exclusively in **Eric W. Prentice** (the "Operating Manager"). Consistent with and subject to the foregoing, the Operating Manager has all the rights and powers that may be possessed by a manager in a limited liability company with managers pursuant to the Act, and such rights and powers as are otherwise conferred by law or are necessary, advisable, or convenient to the discharge of the Operating Manager's duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing, subject to the restrictions set forth in Section 4.2, the Operating Manager has the following rights and powers (which he or she may exercise at the cost, expense, and risk of the Company):

**4.1.1.1.** To expend the funds of the Company in furtherance of the Company's business;

**4.1.1.2.** To perform all acts necessary to fulfill the purposes of the Company, including engaging persons the Operating Manager deems advisable to fulfill those purposes;

**4.1.1.3.** To execute, deliver, and perform on behalf of and in the name of the Company, without any other signature, agreements and documents deemed necessary or desirable by the Operating Manager to carry out the business of the Company, including any lease, deed, easement, bill of sale, mortgage, trust deed, security agreement, contract of sale, or other document conveying, leasing, or granting a security interest in the interest of the Company in any of its assets, or any part thereof, whether held in the Company's name, the name of the Operating Manager, or otherwise; and

**4.1.1.4.** To borrow or raise money on behalf of the Company in the Company's name or in the name of the Operating Manager for the benefit of the Company and, from time to time, to draw, make, accept, endorse, execute, and issue promissory notes, drafts, checks, and other negotiable or nonnegotiable instruments and evidences of indebtedness, and to secure their payment by mortgage, security agreement, pledge, conveyance, or assignment in trust of the whole or any part of the assets of the Company, including contract rights.

**4.2. Restriction on Authority of Operating Manager.** Notwithstanding any other provision of this Agreement, without the prior written approval or consent of a Majority of the

EXHIBIT 2
Page 7 of 21

Members, the Operating Manager does not have any authority to do any of the following (the "Major Decisions"):

4.2.1. Amend the Company's Articles of Organization or this Agreement;

4.2.2. Acquire any land or other real property or interest in land or other real property other than any easement, right-of-way, or other similar interest reasonably required, in the opinion of the Operating Manager, for the ownership or operation of the Company's Property;

4.2.3. Sell, transfer, or exchange all or substantially all of the property owned by the Company; provided, however, this shall not apply to sales in the ordinary course of business;

4.2.4..Execute any lease or other arrangement involving the rental, use, or occupancy of the Property or any part of it if such lease or other arrangement is for a net rentable area of more than 3,000 square feet or is for a term (including renewal options) in excess of five years; or

4.2.5. Construct any improvements or make any capital improvements, repairs, alterations, or changes in or to the Property involving in any instance an expenditure in excess of $10,000, except for matters exptessly delegated to the Operating Manager by the Members.

**4.3. Member's Exercise of Authority.** Notwithstanding any other provision of this Agreement, should any Member who is not an Operating Manager exercise any right or power vested in the Member as a manager of the Company (other than voting or consenting to Major Decisions as provided in Section 4.2), on the approval of Members owning a majority of the Ownership Interests held by Members other than the breaching Member, the Company or such remaining Members have the option, but not the obligation, to purchase and acquire the interest of that Member in the Company for an amount equal to 60% of the amount that the Member otherwise would receive if the Company's assets were then sold and the proceeds distributed in liquidation to all Members in accordance with this Agreement. Payment for that Member's interest in the Company will be unsecured and will not be less than 20% of the purchase price at closing, and 20% of the purchase price on each anniversary of the closing until paid. This paragraph shall not apply to a transaction that does not hinder or restrict working capital and has the effect of increasing Company profits or cause assets of the Company to appreciate; such other Member shall not unreasonably withhold consent to such transaction,

**4.4. Tax Matters Member. Eric W. Prentice** is hereby designated and approved as Tax Matters Member for the Company; in such capacity, Eric W. Prentice is authorized to participate in any audit of the Company's federal income tax return, and in connection therewith, to negotiate, settle, and make agreements and adjustments with respect to the Company's federal

income tax return that will be binding on all the Members; provided, however, that Eric W. Prentice first consult with and obtain the approval of the other Members concerning any audit

EXHIBIT 2
Page 8 of 21

adjustments proposed to be made to the Company's federal income tax return. Eric W. Prentice, as Tax Matters Member, must notify all Members of any final Company audit adjustments.

**4.5. Duties of the Operating Manager.** The Operating Manager must take all actions that may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of Oregon and of each jurisdiction in which such existence is necessary for the Company to conduct the business in which it is engaged and for the accomplishment of the Company's purposes, including the preservation and operation of Company assets in accordance with the provisions of this Agreement and applicable laws and regulations. Notwithstanding the foregoing, the Operating Manager is not required to devote his or her full time to the business and affairs of the Company, but must devote such time as reasonably is necessary to perform his or her duties under this Agreement and prudently to manage or operate the Company's assets and conduct its business.

**4.6. Limitation on Liability of Operating Manager.** The Operating Manager has no liability to the Company or to any other Member for any loss suffered by the Company or any Member that arises out of any action or inaction of the Operating Manager if the Operating Manager, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute gross negligence or intentionally wrongful misconduct.

**4.7. Indemnification of Operating Manager.** The Operating Manager is not personally liable for any debt, obligation, or liability of the Company merely by reason of being the Operating Manager or a Member. To the fullest extent provided or allowed by the laws of Oregon, the Company will indemnify the Operating Manager, in his or her capacity as Operating Manager, from and against all costs, losses, liabilities, damages, claims, and expenses (including attorney fees as incurred at trial and on appeal) (collectively, "Claims") arising from actions or inactions taken or omitted in his or her capacity as Operating Manager, including, without limitation, action taken or omitted by the Operating Manager consistent with this Agreement and in furtherance of the business or affairs of the Company. The satisfaction of any indemnification of the Operating Manager under this Agreement will be from, and limited to, Company assets, and the Members will not have any personal liability on account thereof.

**4.8. Other Business.** Each Member is entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that the Members may enter into transactions that are similar to the transactions into which the Company may enter, and the Company and each Member hereby waive any right or claim to participate in them except as consented to by all of the Members.

EXHIBIT 2
Page 9 of 21

4.9. Decisions by Members. Whenever in this Agreement reference is made to the decision, consent, approval, judgment, or action of the Members, unless otherwise expressly provided in this Agreement, such decision, consent, approval, judgment, or action shall mean a Majority of the Members.

**4.10. Withdrawal by a Member. A** Member has no power to withdraw from the Company.

### SECTION 5. SALARIES, REIMBURSEMENT, AND PAYMENT OF EXPENSES

**5.1. Organization Expenses.** The Company will pay all expenses incurred in connection with organization of the Company.

**5.2. Reimbursements.** The Operating Manager is entitled to reimbursement from the Company for actual out-of-pocket expenses of the Company reasonably incurred in connection with the Company's business.

**5.3. Salary.** No salary will be paid to a Member for the performance of his or her duties under this Agreement unless the salary has been approved in writing by a Majority of the Members. It is agreed, however, that Eric W. Prentice shall receive a salary as operating manager in **the** amount of $55,000.00 per year, payable monthly. The Company shall also pay for medical insurance for Eric W. Prentice and his dependents. In addition, a bonus shall be paid to Eric **W.** Prentice in the amount of 25 percent of net income (after expenses prior to the bonus) for the calendar year; provided, however, if net income is greater than 40 percent but less than 70 percent of the prior Jan. 1 total of all Capital Accounts, such bonus percentage shall be 35 percent of net income; if net income is greater than 70 percent of the prior Jan. 1 total of all Capital Accounts, such bonus shall be 45 percent of net income. For the 1999 calendar year, the total of all Capital Accounts as of April **1,** 1999 shall be used instead of the total of Capital Accounts on Jan, 1, 1999. Such bonus shall be paid on or before March 1 of each year following the applicable calendar year. Net income shall be measured using the accrual method of accounting in accordance with generally accepted accounting principles consistently applied.

**5.4. Insurance. At** all times, the Operating Manager must obtain and keep in full force and effect a comprehensive public liability policy and a property damage policy in amounts, with companies, and on terms acceptable to a Majority of the Members. Each policy of insurance covering any Company property or any portion of any Company property must provide that the policy may not be canceled without at least 10 days' written notice to the Members.

**5.5. Legal and Accounting Services.** The Operating Manager is authorized to obtain legal and accounting services to the extent reasonably necessary for the conduct of the Company's business.

SECTION 6. BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING

6.1. Books of Account. At the expense of the Company, the Operating Manager must maintain records and accounts of all operations and expenditures of the Company at the principal office of the Company. At a minimum, the Company records must include (1) a current list of the

EXHIBIT 2
Page 10 of 21

full name and last-known business, residence, or mailing address of each Member, both past and present; (2) a copy of the Articles of Organization and all amendments; (3) a copy of the Company's currently effective written Operating Agreement and all amendments; and (4) copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years. Each Member has access to these at all reasonable times. The Operating Manager must keep and maintain books and records of the operations of the Company that are appropriate and adequate for the Company's business and for carrying out this Agreement. The Operating Manager must prepare the books and records on the accrual basis using generally accepted accounting principles consistently applied.

**6.2. Accounting Reports.** Within 120 days after the end of each fiscal year of the Company, the Operating Manager must furnish each Member with copies of internally prepared financial statements of the Company.

**6.3. Audit.** At any time, on the written request of a Member, an audit of the accounting books of the Company will occur at the expense of the Company. All Members must cooperate fully with the accountant conducting the audit.

**6.4. Tax Returns.** The Operating Manager must cause to be prepared and, on the review and approval of them by a Majority of the Members, must timely file with the appropriate authorities as necessary all federal and state income tax returns for the Company. Within 90 days after the end of each taxable year, or within a lesser time prescribed by the Internal Revenue Service, each Member will be furnished with a statement that may be used by the Member in the preparation of the Member's income tax returns, showing the amounts of any distributions, gains, profits, losses, deductions, or credits allocated to him or her during the fiscal year.

**6.5. Method of Accounting.** The Company will use the method of accounting previously determined by the Members for financial reporting and tax purposes.

**6.6. Fiscal Year; Taxable Year.** The fiscal year and the taxable year of the Company are the calendar year.

**6.7. Capital Accounts.** The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles set forth in Treasury Regulation §1.704-1(b)(2)(iv).

**OPERATING AGREEMENT - 8**

EXHIBIT 2
Page 11 of 21

**6.8. Banking.** All funds of the Company will be deposited in a separate bank account or in an account or accounts of a savings and loan association in the name of the Company as determined by a Majority of the Members. Company funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States government. Company funds may be withdrawn from Company accounts on the signature of the Operating Manager or Dr. Roderich Bott.

**6.9. Management of Funds.** The Operating Manager must hold and disburse all funds of the Company in accordance with the terms of this Agreement and must account for all funds as a fiduciary. All funds of the Company held by a Member must be held in trust for the benefit of the Company and must not be commingled with other funds of a Member, not be the personal property of a Member, and, to the maximum extent permitted by law, not be vulnerable to inclusion in the bankruptcy estate of a Member.

**6.10. Mandatory Distributions to Members.** The Company shall, on or before April 15 of each calendar year, make cash distributions to each Member an amount equal to 40% of the Member's ratable share of taxable income for federal income tax purposes plus the ratable share of other income items passing through to the Members as a result of the Company's business operations, for the prior calendar year. The distributions may be made earlier with the consent of all Members. Th' intent of this section is to provide Members with cash distributions in an amount approximating the state and federal individual tax applicable from Company income and pass through items taxed to Members.

## SECTION 7. TRANSFER OF MEMBERSHIP INTEREST

**7.1. Sale or Encumbrance Prohibited.** Except as otherwise permitted in this Agreement, no Member may voluntarily or involuntarily, directly or indirectly, transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of (collectively, "Transfer") an interest in the Company without the prior written consent of a majority of the Ownership Interests held by the other nontransferring Members.

**7.2. Right of First Offer.** Notwithstanding Section 7.1, a Member may transfer all or any part of the Member's interest in the Company (the "Interest") as follows:

**7.2.1.** The Member desiring to transfer his or her Interest first must provide written notice (the "Notice") to the other Members, specifying the price and terms on which the Member is prepared to sell the Interest (the "Offer").

**7.2.2.** For a period of 30 days after receipt of the Notice, the Members have the right, but not the obligation, to acquire all, but not less than all, of the Interest at the price and under the terms specified in the Offer. If the other Members desiring to acquire the Interest cannot agree among themselves on the allocation of the Interest among them, the

**PERATING AGREEMENT - 9**

EXHIBIT 2
Page 12 of 21

allocation will be proportional to the Ownership Interests of those Members desiring to acquire the Interest.

7.2.3. Closing of the sale of the Interest will occur as stated in the Offer; provided, however, that the closing will not be less than 45 days after expiration of the 30-day notice period.

7.2.4. If the other Members fail or refuse to notify the transferring Member of their desire to acquire all of the Interest proposed to be transferred within the 30-day period following receipt of the Notice, then the Members will be deemed to have waived their right to acquire the Interest on the terms described in the Offer, and the transferring Member may sell and convey the Interest consistent with the Offer to any other person or entity; provided, however, that notwithstanding anything in Section 7.2 to the contrary, should the sale to a third person be at a price or on terms that are more favorable to the purchaser than stated in the Offer, then the transferring Member must reoffer the sale of the Interest to the remaining Members at that other price or other terms; provided, further, that if the sale to a third person is not closed within six months after the expiration of the 30-day period described above, then the provisions of Section 7.1 will again apply to the Interest proposed to be sold or conveyed.

7.3. Substituted Parties. Any transfer in which the transferee becomes a fully substituted Member is not permitted unless and until:

7.3.1. The transferor and assignee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate in the opinion of counsel to the Company to effect the transfer and to confirm the agreement of the permitted assignee to be bound by the provisions of this Agreement; and

7.3.2. The transferor furnishes to the Company an opinion of counsel, satisfactory to the Company, that the transfer will not cause the Company to terminate for federal income tax purposes or that any termination is not adverse to the Company or the other Members.

7.4. Death, Incompetency, or Bankruptcy of Member. On the death, adjudicated incompetence, or bankruptcy of a Member, unless the Company exercises its rights under Section 7.5 and subject to the exercise of rights by Members under Section 7.6, the successor in interest to the Member (whether an estate, bankruptcy trustee, or otherwise) will receive only the economic right to receive distributions whenever made by the Company and the Member's allocable share of taxable income, gain, loss, deduction, and credit (the "Economic Rights") unless and until a majority of the Ownership Interests held by the other Members admit the transferee as a fully substituted Member in accordance with the provisions of Section 7.3.

C OPERATING AGREEMENT -10

EXHIBIT 2
Page 13 of 21

7.4.1. Any transfer of Economic Rights pursuant to Section 7.4 will not include any right to participate in management of the Company, including any right to vote, consent to, or approve any actions of the Operating Manager, and will not include any right to information on the Company or its operations or financial condition. Following any transfer of only the Economic Rights of a Member's Interest in the Company, the transferring Member's power and right to vote or consent to any matter submitted to the Members will be eliminated, and the Ownership Interests of the remaining Members, for purposes only of such votes, consents, and participation in management, will be proportionately increased until such time, if any, as the transferee of the Economic Rights becomes a fully substituted Member.

7.5. Death Buyout. Notwithstanding Section 7.4, the Members covenant and agree that on the death of atay Member, the Company, at its option, by providing written notice to the estate of the deceased Member within 180 days of the death of the Member, may purchase, acquire, and redeem the Interest of the deceased Member in the Company pursuant to Section 7.5.

7.5.1. The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Exhibit A, which is attached to and made a part of this Agreement. The value of each Member's Interest will be redetermined unanimously by the Members annually, unless the Members unanimously decide to redetermine those values more frequently. The Members will use their best efforts to endorse those values on Exhibit A. The purchase price for a decedent Member's interest conclusively is the value last determined before the death of such Member; provided, however, that if the latest valuation is more than two years before the death of the deceased Member, the provisions of Section 7.5.2 will apply in determining the value of the Member's Interest in the Company.

7.5.2. If the Members have failed to value the deceased Member's Interest within the prior two-year period, the value of each Member's Interest in the Company on the date of death, in the first instance, will be determined by mutual agreement of the surviving Members and the personal representative of the estate of the deceased Member. If the parties cannot reach an agreement on the value within 30 days after the appointment of the personal representative of the deceased Member, then the surviving Members and the personal representative each must select a qualified appraiser within the next succeeding 30 days. The appraisers so selected must attempt to determine the value of the Company Interest owned by the decedent at the time of death based solely on their appraisal of the total value of the Company's assets and the amount the decedent would have received had the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in SECTION 8. The appraisal may not consider and discount for the sale of a minority interest in the Company or the lack of marketability of such interest. In the event the appraisers cannot agree on the value within 30 days after being

**L C OPERATING AGREEMENT -11**

EXHIBIT 2
Page 14 of 21

selected, the two appraisers must, within 30 days, select a third appraiser. The value of the Interest of the decedent in the Company and the purchase price of it will be the average of the two appraisals nearest in amount to one another. That amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the third appraiser and any costs and expenses of the appraiser retained but not paid for by the estate of the deceased Member will be offset against the purchase price paid for the deceased Member's Interest in the Company.

**7.5.3.** Closing of the sale of the deceased Member's Interest in the Company will be held at the office of the Company on a date designated by the Company, and will not be later than 90 days after agreement with the personal representative of the deceased Member's estate on the fair market value of the deceased Member's Interest in the Company; provided, however, that if the purchase price is determined by appraisals as set forth in Section 7.5.2, the closing will be 30 days after the final appraisal and purchase price is determined. If no personal representative has been appointed within 60 days after the deceased Member's death, the surviving Members have the right to apply for and have a personal representative appointed.

7.5.4. The purchase price will be paid by the Company by executing and delivering its promissory note for the purchase price, with interest at the prime interest rate stated by US Bank at the time of the deceased Member's death. Interest will be payable monthly, with the principal sum being due and payable in three equal annual installments. The promissory note will be unsecured and will contain provisions that the principal sum may be paid in whole or in part at any time, without penalty.

7.5.5. At the closing, the deceased Member's estate or personal representative must assign to the Company all of the deceased Member's Interest in the Company free and clear of all liens, claims, and encumbrances, and, at the request of the Company, the estate or personal representative must execute all other instruments as may reasonably be necessary to vest in the Company all of the deceased Member's right, title, and interest in the Company and its assets. If either the Company or the deceased Member's estate or personal representative fails or refuses to execute any instrument required by this Agreement, the other party is hereby granted the irrevocable power of attorney which, it is agreed, is coupled with an interest, to execute and deliver on behalf of the failing or refusing party all instruments required to be executed and delivered by the failing or refusing party.

7.5.6. On completion of the purchase of the deceased Member's Interest in the Company, the Ownership Interests of the remaining Members will increase proportionately to their then-existing Ownership Interests.

**7.6. Deadlock Buyout.** The provisions of this Section 7.6 shall apply if (1) this Agreement requires the unanimity of the Members, (2) the Members cannot agree among

**AGREEMENT -12**

EXHIBIT 2
Page 15 of 21

themselves as to a decision or course of action (a "Deadlock"), (3) a Member delivers to the other Members a written notice of the Member's election to invoke the provisions of this Section 7.6 (a "Deadlock Notice"), and (4) unanimity cannot be reached within 45 days after delivery of the Deadlock Notice to the other Members.

7.6.1. A Member who believes that there is a Deadlock may deliver to the other Members 'a Deadlock Notice stating with particularity the issue or decision on which the Member believes there is a Deadlock. If the Members cannot resolve the Deadlock within 45 days after delivery of the Deadlock Notice to other Members (the "Resolution Period"), then during the 30-day period after expiration of the Resolution Period, any Member (the "Initiating Member") may deliver to the other Members (the "Responding Members") a written notice (the "Buyout Notice") invoking the provisions of this Section 7.6. The Buyout Notice shall set forth a dollar figure selected by the Initiating Member for the total value of the Company's assets, such value to be determined without regard to any debts, mortgages, or other liabilities of the Company (which figure is hereinafter referred to as the "Total Asset Value").

7.6.2. Within 60 days after the delivery of such notice by the Initiating Member, the Responding Members or any of them shall furnish written notice to the Initiating Member electing either to purchase the Initiating Member's entire rights and interests in the Company or to sell the Responding Members' entire rights and interest in the Company to the Initiating Member, at the cash purchase price provided for in Section 7.6.5. If the Responding Members shall not effectively give either notice, then the Responding Members shall be deemed to have elected to sell their rights and interests in the Company to the Initiating Member at such purchase price.

7.6.3. For purposes of this Section 7.6.3, the election of the Responding Members shall be determined in accordance with the following:

7.6.3.1. If all Responding Members elect to acquire the Initiating Member's interest, the Responding Members shall acquire that interest proportionately to their respective Ownership Interests or as they otherwise may agree;

7.6.3.2. If less than all the Responding Members elect to acquire the Initiating Member's interest, the Responding Members so electing shall acquire the Initiating Member's interest proportionately to the Ownership Interests of the Responding Members electing to purchase, or in such other proportions as they may otherwise agree;

**7.6.3.3.** If none of the Responding Members elects to acquire the Initiating Member's interest, then the Initiating Member must acquire all of the interests of alLResponding Members; or

# AGREEMENT -13

EXHIBIT 2
Page 16 of 21

7.6.3.4. Responding Members cannot acquire the interests of other Responding Members who do no elect to participate in the acquisition of the Initiating Member's interest as the result of a Deadlock except in accordance with the provisions of this Section 7.6 wherein such purchasing Responding Member becomes an Initiating Member.

7.6.4. Closing shall take place on the 30th day after the expiration of the 60-day period provided in Section 7.6.2 for the giving of notice of election by the Responding Members or, if that 30th day shall fall on a weekend or a holiday, then on the next ensuing business day thereafter. The closing shall occur at a time and place in Portland, Oregon, to be designated by the purchasing Member. At the time and place of closing, the selling Member(s) shall convey, transfer, and assign to the purchasing Member(s) by assignment, bill of sale, and such other instruments of transfer as shall reasonably be required, all of the selling Members' rights and interests in and to the Company and all its assets, and shall, to the extent requested by the purchasing Member(s), cooperate to effect the smooth and efficient continuation of Company affairs.

7.6.5. The purchase price to be paid by the purchasing Member(s) to the selling Member(s) shall be equal to the amount that the selling Member(s) would have received if all of the Company's assets had been sold on the date of closing for a cash price equal to the Total Asset Value, and the proceeds thereof were applied and distributed in the manner provided in SECTION 8 of this Agreement, except that any reserves for contingencies shall not be taken into account for this purpose. The purchase price shall be payable in its entirety in cash, cashier's check, wire transfer, or certified funds (which funds shall be immediately available in Portland, Oregon) at closing.

## SECTION 8. DISSOLUTION AND WINDING UP OF THE COMPANY

**8.1. Dissolution.** The Company will be dissolved on the happening of any of the following events:.

**8.1.1.** The consent of all of the Members to dissolve the Company; or

**8.1.2. By** operation of law.

**8.2.** Winding Up. On the dissolution of the Company, the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with SECTION 3 this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

**OPERATING AGREEMENT - 14**

EXHIBIT 2
Page 17 of 21

**8.2.1.** To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to persons or organizations including Members; and

**8.2.2.** To Members in the amount of their respective adjusted Capital Account balances on the date of distribution; provided, however, that any then-outstanding Default Advances (with interest and costs of collection) first must be repaid from distributions otherwise allocable to the Defaulting Member pursuant to SECTION 2.

## SECTION 9. GENERAL PROVISIONS

**9.1. Amendments.** Any Member may propose amendments to this Agreement. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all the Members.

**9.2. Governing Law.** This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the state of Oregon (without regard to principles of conflicts of law).

**9.3. Waiver of Action for Partition.** Each of the Members irrevocably waives, during the existence of the Company and during the period of its winding up and liquidation following any event of dissolution, any right that the Member may have to maintain any action for partition with respect to any of the assets of the Company.

**9.4. Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all parties had signed the same counterpart. All counterparts will be construed together and will constitute one and the same Agreement. A single counterpart may be introduced as evidence of this Agreement.

**9.5. Parties in Interest.** Subject to the limitations on transfers of membership interests set forth in SECTION 7 of this Agreement, each and every covenant, term, provision, and agreement is binding on and inures to the benefit of the parties and their heirs, successors, assigns, and legal representatives.

**9.6. Entire Agreement; Modification.** This Agreement constitutes the entire understanding anl agreement between the Members with respect to the subject matter of this Agreement. There are no agreements, understandings, restrictions, representations, or warranties between the Members other than those in this Agreement or referred to or provided for in this Agreement. No modification or amendment of any provision of this Agreement will be binding on any Member unless it is in writing and signed by all the Members.

**9.7. Attorney Fees.** In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled

**OPERATING AGREEMENT - 15**

EXHIBIT 2
Page 18 of 21

to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

9.8. Furtger Effect. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

9.9. Severability. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

9.10. Captions. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

9.11. Notices. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to any other address that a Member may specify by notice given in conformance with these provisions to the other Members.

**9.12. Written Approval or Consent.** All approvals or consents required to be given by this Agreement will be in writing and will be effective when actually delivered or, if mailed, when deposited as certified mail, postage prepaid, directed to the addresses first shown above for each Member or to any other address that a Member may specify by notice given in conformance with these provisions to the other Members or by facsimile signed and sent to the last known facsimile number provided to the Company.

**9.13. Use of Name.** In the event that Roderich Bott ceases to be a Member and none of his family (spouse, ancestral or lineal descendants) is a Member of the Company, the Company has the option to enter into a royalty agreement with Roderich Bott or the appropriate representative or family member for a license to use the name, "Dr. Bott" in the company name after execution of a standard royalty agreement which terms include the payment of a 1 percent royalty on Company sales payable on a calendar quarter basis within 30 days after the end of such quarter. At the Company's option, such royalty agreement will also include terms allowing the Company to purchase the name on a first right of refusal basis in the event Roderich Bott chooses to sell the name, "Dr. Bott".

**IN WITNESS WHEREOF,** the parties to this Agreement execute this Operating Agreement as of the date and year first above written.

**DR BOTT LLC TING AGREEMENT-16**

EXHIBIT 2
Page 19 of 21

Dr. Roderic') Bott: _____

Eric W. Prentice: _____

**DR.SMC OPERATING AGREEMENT -17**

EXHIBIT 2
Page 20 of 21

EXHIBIT A

VALUATION

The Members hereby agree that the valuation of the Company is 60 thousand dollars.

**Dr. Roderich Bott:** _____    Mar 27th, 1999
                                                    Date

**Eric W. Prentice:** _____    _____
                                                    **Date**

**AGREEMENT - 18**

EXHIBIT 2
Page 21 of 21

1   Tara J. Schleicher, OSB #954021
    tschleicher@fwwlaw.com
2   Farleigh Wada Witt
    121 SW Morrison Street, Suite 600
3   Portland, Oregon 97204-3136
    Telephone: (503) 228-6044
4
          Attorneys for Dr. Roderich Bott
5

6
                  IN THE UNITED STATES BANKRUPTCY COURT
7
                      FOR THE DISTRICT OF OREGON
8
    In re                              |   Case No. 14-32565-tmb11
9
    Dr. Bott, LLC,                     |
10                                     |   DECLARATION OF KATHERINE HEEKIN
                          Debtor.      |   IN SUPPORT OF DR. RODERICH BOTT'S
11                                     |   OBJECTION TO APPLICATION TO
                                       |   EMPLOY FIELD JERGER, LLP AS
12                                     |   COUNSEL FOR DEBTOR
                                       |
13

14          I, Katherine Heekin, do hereby declare as follows:

15          1.      I am one of the attorneys for Dr. Roderich Bott ("Bott").  I make this

16   declaration based upon my own personal knowledge.

17          2.      On behalf of Bott, I previously sought and obtained advice from Peter

18   Jarvis' partner relating to ethical issues raised by conduct of the former LLC's counsel in the

19   state court case.  The conflict check completed by Holland & Knight when Field asked Jarvis for

20   advice did not alert the parties to the prior advice Jarvis' partner gave to Bott in the state court

21   case.  To obtain any update of the Opinion Letter, a request must be made to Holland & Knight

22   jointly by Bott and Prentice.

23          3.      I attach as Exhibit 1, a true and correct copy of a letter from Lawrence M.

24   Vergun to Eric Postma dated November 7, 2011.

25          4.      I attach as Exhibit 2, a true and correct copy of an email from Eric Postma

26   to Larry Vergun dated November 28, 2011.

DECLARATION OF KATHERINE HEEKIN IN SUPPORT OF DR. RODERICH BOTT'S
OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR
DEBTOR
P:\DOCS\DRBOTT\07047\PLDG\3IU760202.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

1        5.        I attach as Exhibit 3, a true and correct copy of the deposition transcript of

2   Eric W. Prentice, taken June 28, 2012.

3        6.        I attach as Exhibit 4, a true and correct copy of my letter to the Honorable

4   Alicia A. Fuchs dated March 17, 2014.

5              I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE

6   BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE

7   FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

8              Dated: June 12, 2014.

9

10                                      /s/ Katherine Heekin
                                        Katherine Heekin, OSB #944802

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 of 2 -      DECLARATION OF KATHERINE HEEKIN IN SUPPORT OF DR. RODERICH BOTT'S
                   OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR
                   DEBTOR
                   P:\DOCS\DRBOTT\07047\PLDG\3IU760202.DOC

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

# HARRIS LAW FIRM, P.C.

## Attorneys at Law

November 7, 2011

VIA U.S. MAIL and EMAIL: epostma@bittner-hahs.com

Eric S. Postma
Bittner & Hahs, P.C.
4949 SW Meadows Road, Suite 260
Lake Oswego, OR 97035

ATTORNEYS

Robert J. Harris*

Amy N. Velázquez

Wallace D. Terry

Lawrence M. Vergun+

M. Casey Gibbens++

Paul J. Vomes**

Matthew C. McKean

Jennifer C. Robins

Ryan Anfuso

Jon Weiner, Of Counsel

*Admitted to practice in Washington
+Admitted to practice in California
**Admitted to practice in Nevada
++Admitted to practice in Kansas

   RE:   Dr. Bott LLC / Demand Letter

Dear Eric:

This letter is a demand letter directed towards Mr. Eric Prentice, and also directed towards Dr. Bott LLC, demanding that the LLC institute a legal action against Mr. Prentice to avoid a derivative action forcing the LLC to do so.

I understand that you do not represent Mr. Prentice in any individual capacity. However, since the matters in the letter affect both Mr. Prentice individually, as well as the LLC, I did not want to communicate directly with Mr. Prentice with respect to the issues mentioned in this letter for which the LLC also has a legal interest. I am therefore sending this letter to you. I trust that you will forward this letter to Mr. Prentice immediately and continue to advise him that he should retain independent counsel. I will direct communications through you instead of directly to Mr. Prentice, until either you or Mr. Prentice instruct me otherwise.

In this letter, my client will be making financial demands which are directed to Mr. Prentice, demanding that he pay my client to prevent a lawsuit from being filed against him. The payment of money is towards payment of compensatory damages that my client has sustained due to, among other things, breach of the Operating Agreement.

This letter also includes a demand that the LLC itself institute a lawsuit against Mr. Prentice. We understand that you, as company counsel, will evaluate what is in the company's interests, and determine how to respond based on those interests.

Finally, this letter also includes conditions to avoid an imminent filing of a lawsuit by my client. The fulfillment of those conditions (namely, commencing an audit and the signing of a tolling of statute-of-limitations agreement) require the agreement of all parties, including the LLC.

Locations:

Main Office:
165 S.E. 26th Avenue
Hillsboro, Oregon 97123

Portland Office:
6400 SE Lake Road
Suite 440
Portland, Oregon 97222

Bridgeport Office:
7455 SW Bridgeport Road
Suite 220
Tigard, Oregon 97224

Phone (503) 648-4777
Fax (503) 648-0989

www.harrislawsite.com
info@harrislawsite.com

Vergun Decl

EX ____I____
PAGE ___I___ OF _7_

EXHIBIT 1
Page 1 of 7

Eric S. Postma
Bittner & Hahs, P.C.
Re: Dr. Bott LLC / Demand Letter
November 7, 2011
Page Two

## Background

For quite some time, we have been looking at the LLC records, income tax returns, QuickBooks files, and other information that we have been able to gain access to, regarding the LLC. What we discovered is troubling, and it pertains to Eric Prentice's failure to meet his fiduciary duties to both the LLC and to my client, in Eric Prentice's capacity as part owner, as the "Operating Manager" as described in the Operating Agreement, and as tax matters member. I will outline some of the things we discovered in this letter.

As you may know, Mr. Prentice has a duty not only to see that the books and records are prepared properly, but also to utilize the correct professionals and to keep proper systems in place in connection with the financial and tax affairs of the company. This duty is heightened by virtue of the fact that Mr. Prentice personally benefits, in years in which the operations income is positive, through an Annual Bonus, which can be as much as 45% of income in any one year. Thus, errors and mis-statements of income or expense items can materially affect Mr. Prentice's overall compensation dramatically (i.e. for every $100,000 of overstated income, the bonus is erroneously increased by $45,000). We have calculated that damages caused by Mr. Prentice exceed $960,000.

## Demand for Payment

We are demanding that an amount of $960,000 be repaid to the LLC by Mr. Prentice. Demand is hereby made to Mr. Prentice that he pays back a sum of $960,000 within fourteen (14) days of the date of this letter.

We are also demanding that Mr. Prentice pay Dr. Roderich Bott directly for damages caused by, among other things, the breach of the Operating Agreement between the parties.

## Conditions Required to Prevent Immediate Filing of a Lawsuit

In the event of non-payment of our demand, my client has instructed me to file a lawsuit on his behalf. The lawsuit shall assert claims that my client has directly against Mr. Prentice, and will also include a derivative action forcing the LLC to assert claims against Mr. Prentice.

However, my client will hold off filing a lawsuit, to enable the parties more time and opportunity to obtain further information, but only if both of the conditions below are met. These conditions are non-negotiable.

    a.    Company Audit. Enclosed please find an audit demand for years 2008, 2009, and 2010. While we demand and expect that the Company proceed with the enclosed audit regardless of whether a lawsuit is filed or not filed by my client, my client will hold off filing a lawsuit if the Company enters into a standard, written agreement with one of the auditors listed below within fourteen (14) days of the date of this letter. The actual audit must commence immediately thereafter.

EXHIBIT 1
Page 2 of 7

Eric S. Postma
Bittner & Hahs, P.C.
Re:  Dr. Bott LLC / Demand Letter
November 7, 2011
Page Three

As stated in the Operating Agreement, the audit is paid for by the Company, and the Company and all members must cooperate fully with the auditor. Below is a list of acceptable auditors, all of which are well regarded within the greater Portland community.

> John Lauseng at Aldrich, Kilbride & Tatone
> Steve Tatone at Aldrich, Kilbride & Tatone
> Dave Porter at Geffen Mesher & Company
> Jennifer Dale at McDonald Jacobs, PC
> Gabe Nachand and Todd Wall at Moss Adams
> Alex Corrigan at Delap
> Steve Tatone at Aldrich, Kilbride & Tatone

b.    Tolling of Statute of Limitations Agreement.  A standard tolling of statute-of-limitations agreement will need to be signed within fourteen (14) days of the date of this letter, having the effect of tolling the statute of limitations period for any and all claims related, directly or indirectly, to the Company, its finances, and its operations.

In our case, the agreement will be signed by, and will bind, all members and the Company with respect to all claims that they have, or may have, against one another.  The agreement will also be binding against all of the party's agents, employees, representatives, heirs, personal representatives, and successors in interest. Any party (that is, any member or the Company) may send to the other parties a 30 days' written notice that the entire tolling agreement shall expire in 30 days as to all claims that the agreement covers. During the time that it is effective, however, the agreement will suspend the running of any applicable statute of limitations period from the date of the agreement until the time (if and when) it expires following the 30 days' written notice.

My client's demand is based on the following:

## Tradeshow Prepaids

This matter has also been discussed in prior correspondence. It appears from your prior correspondence that Mr. Prentice is aware that he has been over-compensated in year 2007, as a result of this deviation from GAAP rules, and that he will need to repay money to the Company. As you know, the Operating Agreement requires that Mr. Prentice be paid a bonus based on a formula tied to income before bonus, where the income is "measured using the accrual method of accounting in accordance with generally accepted accounting principals consistently applied."

Although we have not calculated a final figure, it appears that the overpayment of bonus in 2007 was approximately $115,000. This figure does not include income taxes that the Company paid on Mr. Prentice's behalf, plus other consequential damages.

EX    1
PAGE  3  OF  4

EXHIBIT 1
Page 3 of 7

Eric S. Postma
Bittner & Hahs, P.C.
Re:  Dr. Bott LLC / Demand Letter
November 7, 2011
Page Four

## Inventory Overstatement in 2003 / and Related 2006 Entries

There exists an error in overstating inventory in 2003 by $345,416 (a bonus year), which was not corrected entirely until 2006 (a loss year). Due to this error, the excess in bonus paid to Mr. Prentice for in 2003 was over $150,000.

The correction of the 2003 overstatement was done improperly, and in subsequent years, in stages. The last stage "landed" on a loss year (2006) where $314,612 was recorded as an increase in cost of goods sold and as a credit to a new Balance Sheet Account called 1204- Adj. Accrual based system, a contra Inventory account. When the IRS Auditors inquired about this entry during the 2006 IRS audit last year, the Company responded that they did not know what this entry was for. We now know it was part of "correction" during a loss year (2006) of the 2003 overstatement.

We have not calculated the precise amount of damages, but it is certainly well over $150,000.

## 2004 Overpayment of Bonus

In 2004, Mr. Prentice was paid $85,000 in a mistaken bonus included in his W-2, along with his regular compensation of $86,000. This payment was made in error, since all bonuses earned had been paid. There exist additional consequential damages resulting from this overpayment, including payroll and income taxes paid on Mr. Prentice's behalf.

## January 2006 Inventory Write-Off Should Have Been Made in 2005

This issue relates to the write-off of "worthless inventory" in a January 31, 2006 Journal Entry of about $136,000. The write-off should have occurred in 2005, not 2006. As a result of this error, the inventory for 2005 (a bonus year) was overstated by approximately $136,000, and the income before bonuses was also overstated. These overstatements had the effect of causing an overpayment of the 2005 bonus by approximately $61,000. This figure does not include income taxes that the Company paid on Mr. Prentice's behalf, plus other consequential damages.

## Mistaken Overpayment of a Bonus of $38,000 for Year 2005

There exists a mistaken overpayment of Mr. Prentice's 2005 bonus in the amount of approximately $38,000 which does not appear to have been repaid by Mr. Prentice.

EXHIBIT 1
Page 4 of 7

Eric S. Postma
Bittner & Hahs, P.C.
Re: Dr. Bott LLC / Demand Letter
November 7, 2011
Page Five

## Wages vs. Guaranteed Payments

Under Reg. 1.707-1(c) and Revenue Ruling 56-675, "A partner who received a guaranteed compensation payment is not regarded as an employee of the partnership for the purpose of withholding of income or Social Security taxes or for any pension (retirement) plans". Fringe benefits provided to a partner is treated as a Guaranteed Payment (Revenue Ruling 91-26). Fringe benefits would include health insurance premiums.

Social Security taxes paid on Mr. Prentice's salary by the Company (50% of the total) was neither permitted under the Operating Agreement nor compliant with IRS regulations. During the period of time in which the Company paid for such items, Mr. Prentice wrongfully obtained more than $50,000 of taxes paid on his behalf. We do not know whether this practice is still occurring.

## Participation by a Partner in an Employee 401-K Plan

An LLC that elects to be treated as a partnership and files an annual partnership return, Form 1065, falls under the Internal Revenue Service Tax Codes and Regulations of a Partnership. Thus, members of the LLC, who are active in the operations of the LLC and are compensated either by a fixed annual amount or annual bonuses, are considered "non-employees" and must be paid Guaranteed Payments, with no Social Security tax nor income tax withheld. Guaranteed Payments are reported to the Member on his K-1 and also as self-employment income, which the member would be responsible for reporting on his individual income tax return and for paying the full amount of Social Security taxes (S/E tax) due. Further, as a non-employee, no members or partners can participate in the LLC employees' 401-K plan, nor can the LLC make contributions to the non-employee's 401-K plan on his behalf.

We know that between January 1, 2004 and December 31, 2009 over $500,000 of payments were made to Nationwide Trust, the 401-K Administrator. We estimate that the total amount of LLC funds that may have been wrongfully used for Mr. Prentice's benefit, as well as earnings that he wrongfully obtained from those funds for all years, is at minimum an amount of $200,000, and could be significantly more than that. My client would need a full accounting of funds to evaluate the actual damages caused with respect to this issue.

## Loans for Mr. Prentice and
## How They Were Treated on the Books

In the early years when the business was starting out, my client agreed to loan Mr. Prentice personally $55,000 towards Mr. Prentice's purchase of his new home, and for which the Company would be able to use it as an office/warehouse. My client wired the $55,000 funds to the Company (minus a small amount for wiring fees) with the understanding that the Company would, in turn, deliver the funds to Mr. Prentice, without the Company being the payee of the loan. Instead, the Company set up a Loan Payable to my client, and actually wrote a check from the Company to Mr. Prentice for $89,000.

EX
PAGE   5   OF   7
EXHIBIT 1
Page 5 of 7

Received Time Nov. 9. 2011 11:02AM No. 0034

Eric S. Postma
Bittner & Hahs, P.C.
Re: Dr. Bott LLC / Demand Letter
November 7, 2011
Page Six

Then, approximately two or three years later, the payable to my client (that is, in my client's favor) for the $55,000 all of a sudden became a loan due from my client to the Company of $55,000. This erroneous receivable was written off to my client's capital account, and Mr. Prentice's capital account was increased at the same time by the $55,000. This was incorrect and needs to be adjusted accordingly.

Now, Mr. Prentice is paying monthly payments directly to my client for the $55,000 loan. The damage to the Company is $34,000. Therefore, the damage to the Company is the remaining amount of $34,000, and there are no entries or other evidence that that amount was repaid to the Company by Mr. Prentice.

### Clarification Required Regarding
### Transactions in 2006, 2007, 2008 and 2009,
### and Clarification Regarding Life Insurance Policies

There are several journal entries that appear very unusual, including Marware transactions (2006); as well as other journal entries and transactions made in 2007, 2008 and 2009. We would require additional information on these transactions, and we are presently unable to determine the amount of any claim that may exist with regards to these transactions. In several instances, it appears that GAAP procedures were not followed. The transactions that appear to be very unusual are too numerous to mention in this letter.

We also lack information on the nature of a life insurance policy apparently being paid by the Company on Eric Prentice's life. If any one other than the Company itself is a beneficiary to that life insurance policy, then Mr. Prentice has wrongfully received additional monies from the Company.

### Conclusion

Please note that due to the complexity of some of these transactions, and because investigation is still ongoing, the amounts of damages alleged cannot be precisely calculated at this time, and are subject to change based on any newly acquired information. My client reserves all rights set forth in the Operating Agreement and applicable law.

We look forward to having you and Mr. Prentice's own attorney contact my office.

Sincerely,
HARRIS LAW FIRM, P.C.

Lawrence M. Vergun
Attorney at Law

LMV:drh
Enclosures:   As Indicated
cc: client (w/Encl)

EX _____
___ __ C OF ___
EXHIBIT 1
Page 6 of 7

REQUEST FOR AUDIT

Notice is hereby given that, pursuant to Section 6.3 of the Operating Agreement dated April 1, 1999 for Dr. Bott LLC, that member Dr. Roderich Bott hereby requests an audit, of the accounting books of the Company, at the expense of the Company, for the following years:

Year 2010
Year 2009
Year 2008

Dr. Roderich Bott reserves all rights as provided in Section 6.3 of the Operating Agreement and under applicable law to request an audit of other years, and for other matters.

Dated: __November 7, 2011__

Lawrence M. Vergun, OSB# 96173
Attorney for Dr. Roderich Bott

**From:** Eric Postma [mailto:epostma@bittner-hahs.com]
**Sent:** Monday, November 28, 2011 4:07 PM
**To:** Larry Vergun
**Cc:** Alex Corrigan; Katherine Heekin; Mike Layne; Bob McGaughey
**Subject:** RE: Conference call information for tomorrow (Tuesday's) call / Re: Dr Bott LLC

Larry:

Thank you for making the effort to set up a conference call, but I question whether it is necessary or advisable at this point in time.

The Operating Agreement of Dr. Bott, LLC entitles your client to an audit upon request. Your letter of November 7, 2011, and the concurrent Request for Audit open-endedly asked for an audit for tax years 2008 through 2010 without limitation of any kind. If you now believe it is necessary to define the scope of the audit, perhaps that should begin with you providing an indication in writing to Dr. Bott, LLC what you believe the scope of that audit should be, which can then be communicated to Alex Corrigan when appropriate. This is not stated in an effort to limit the audit, but rather in an effort to avoid confusion that could result from a telephone conversation with attorneys for three parties giving input to the auditor.

Please note that my previous indications that Alex Corrigan would review some preliminary documentation was not pursuant to an attempt to limit the scope of an audit, but rather to await word from him regarding the expected activities of an audit with an eye towards predictability of cost. I believe Alex's recent correspondence provides some of that predictability.

As to standards of communication during the course of the audit, I would assume that Alex will be able to communicate that standard in writing once engaged. If your written indication of the scope of the audit is not in dispute, then I would expect that Alex Corrigan can be engaged immediately.

In general, I believe that the nature of the dispute at present suggests that conducting any communications with regard to the audit in writing will prevent misunderstandings about the process.

As a final note, Dr. Bott, LLC has engaged Bob McGaughey as counsel in the dispute suggested by your letter of November 7, 2011. His e-mail address is included amongst the courtesy copies above, and I would appreciate if all counsel could include Bob in future e-mails.

**Eric S. Postma**
Attorney at Law
Bittner & Hahs, P.C.
4949 SW Meadows Road, Suite 260
Lake Oswego, OR  97035
(503) 445-4307 Direct Line
(503) 228-5626 Main Line
(503) 228-8566 Fax Line

EXHIBIT 2
Page 1 of 1

Page 1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

DR. BOTT, LLC, an Oregon          )
limited liability company,        )
                                  )
          Plaintiff,              )
                                  )
            v.                    )   Case No. 1112-15996
                                  )
ERIC W. PRENTICE,                 )
                                  )
          Nominal Plaintiff,      )
                                  )
DR. RODERICH BOTT,                )
                                  )
          Defendant.              )
_____       )
                                  )
DR. RODERICH BOTT,                )
                                  )
          Defendant,              )
                                  )
            v.                    )
                                  )
ERIC W. PRENTICE and DR.          )
BOTT, LLC, an Oregon limited      )
liability company,                )
                                  )
          Plaintiffs.             )

VIDEO DEPOSITION OF ERIC W. PRENTICE

June 28, 2012

**CONFIDENTIAL**

**ORIGINAL**

Reported by:

Karen M. Edwards, CSR

EXHIBIT 3
Page 1 of 3

Page 175

1   that Dr. Bott propounded upon the LLC, who did that
2   work?
3      A.  So, Mark Steed did, I believe, he did the
4   primary -- or the most amount of work.  But it has been
5   a large task so a lot of people have been involved.
6      Q.  Were you involved?
7      A.  Yeah.
8      Q.  And do you recall Mr. Steed asking you where
9   he might find minutes?
10     A.  No.
11     Q.  Do you recall directing him to look for
12  minutes?
13     A.  No.
14          (Deposition Exhibit No. 24 marked for
15          identification.)
16  BY MS. HEEKIN: (Continuing)
17     Q.  Okay.  This is the Complaint that's been filed
18  in this case.  Were you involved in providing the
19  information that's in this Complaint?
20     A.  Yes.
21     Q.  And who did you work with?
22          MR. LAYNE:  You mean, other than his
23  attorneys?
24          MS. HEEKIN:  No.  I want to know if he
25  worked with his attorney.  I can know that.

Page 176

1   BY MS. HEEKIN: (Continuing)
2      Q.  Who did you work with to prepare this
3   complaint?
4      A.  Yeah, we worked with our attorneys.
5      Q.  Who?
6      A.  I -- I know Bob McGaughey was primarily
7   involved.  I'm not sure what role Eric Postma might have
8   had.
9      Q.  Do you think they both worked with you?
10     A.  I don't know what role Eric Postma had.  There
11  was a point where he was no longer involved, I don't
12  know what point that was.
13     Q.  Okay.  Let's look at paragraph -- well, other
14  than you and the lawyers that you mentioned, did anybody
15  else participate in the information -- anybody else from
16  the company participate in putting together the
17  information or providing the information that was the
18  basis of this complaint?
19     A.  Yes.
20     Q.  Who?
21     A.  The -- so, Mark Balsiger our COO was -- played
22  a large role.  And then he -- I know he needed
23  information from accounting and other parts of the
24  company.
25     Q.  What was Mark Balsiger's role in providing

Page 177

1   information?
2      A.  I'm not sure how to characterize his role.  I
3   know he provided information, provided thoughts,
4   perspective.
5      Q.  Did he sit in an interview, or did he provide
6   information written form?
7      A.  I believe both.
8      Q.  Were you present in that interview also?
9      A.  He's had -- by "interview" I assume you're
10  meaning conversations.  And so I know he's had lots of
11  conversations with the company's attorneys.
12     Q.  At the time that the company was --
13     A.  Both with and without me, to answer your
14  question.
15     Q.  At the time that the company was having this
16  complaint prepared, were you and Mr. Balsiger in the
17  meetings together, or did you have separate meetings
18  with the attorneys?
19     A.  As far as meetings with the attorneys, I can't
20  tell you definitely that all of them were with both of
21  us, but it seems like the majority of them would have
22  been with both of us.
23     Q.  Now, the work that you did related to this
24  complaint was after Dr. Bott, through his lawyer
25  Mr. Vergun, had sent a demand letter to the company

Page 178

1   accusing you of violating your fiduciary duties, right?
2      A.  I believe so.
3      Q.  Okay.  Looking at paragraph 11 of the
4   complaint, the first paragraph there where it's alleged
5   that Dr. Bott used KG as a lever, exercised the rights
6   and powers of an operating manager.  And then an example
7   is given:  KG owed Dr. Bott LLC approximately 500,000
8   for product purchased from the LLC that was as alleged
9   here 400 days past due.
10         When did that occur?
11     A.  I can't tell you the exact dates, but I know
12  -- I mean, 400 days is -- it was ongoing for a long
13  time.
14     Q.  In what year?
15     A.  I can't tell you off the top of my head what
16  year.
17     Q.  2008 -- 2007, 2008 sound right?
18     A.  It sounds correct.
19     Q.  And that was resolved, wasn't it?
20     A.  That was resolved?  Yes, KG eventually paid
21  their bill.  I think maybe the word settled would be
22  more appropriate.
23          (Deposition Exhibit No. 25 marked for
24          identification.)
25  BY MS. HEEKIN: (Continuing)

49  (Pages 175 to 178)

EXHIBIT 3
Page 2 of 3

CERTIFICATE

1
2
3      I, Karen M. Edwards, a certified Shorthand

4  Reporter for Oregon, hereby certify that, pursuant to

5  Oregon Rules of Civil Procedure, ERIC W. PRENTICE

6  personally appeared before me at the time and place set

7  forth in the caption hereof; that at said time and place

8  I reported in Stenotype all testimony adduced and other

9  oral proceedings had in the foregoing matter; that

10  thereafter my notes were reduced to typewriting under my

11  direction, and that the foregoing transcript, pages 1 to

12  238, both inclusive, constitutes a full, true and

13  accurate record of all such testimony adduced and oral

14  proceedings had, and of the whole thereof.

15
16
17      Witness my hand CSR seal at McMinnville,

18  Oregon, this 1st day of July, 2012.

19
20
21  _____

22  Karen M. Edwards
    Certified Shorthand Reporter
23  Certificate No. 90-0145

24
25

CARR COURT REPORTING
(503) 227-2277

Katherine R. Heekin
katherine@heekinmedeiros.com
Licensed in Oregon and Washington

# HEEKIN MEDEIROS P.C.

March 17, 2014

**VIA HAND-DELIVERY**

Honorable Alicia A. Fuchs
Circuit Court Judge
534 Multnomah County Courthouse
1021 SW 4th Avenue
Portland, OR  97204

Re:    **Dr. Bott LLC v Dr. Roderich Bott, Multnomah County Case No. 1112-15996**
       **Removal of Stay of Proceedings by Oregon Supreme Court / Important**
       **Pending Matters**

Dear Judge Fuchs:

As you know, the Oregon Supreme Court denied Mr. Edelson's and Mr. McGaughey's
petition for Writ of Mandamus last Friday, March 14, 2014, and lifted the stay of
proceedings in the trial court. Last week as well, on March 11, 2014, before the Supreme
Court's order issued, an attorney named Joseph Field sent an email to me.  He wrote in
part,

> "Dr. Bott, LLC hired me to advise it on its current financial situation.  I
> understand that Dr. Bott LLC has increasing liabilities from its inability to
> pay its bills in full each month.  I further understand that Dr. Bott, LLC
> and its two members are in litigation that has deadlocked the company."

(Ex 1 at 3, Email of 3/11/14.)  I asked Mr. Field to provide the LLC's current financial
statements and a list of Accounts Payable and Accounts Receivable to understand the
context for his email.  (Id. at 2, Email of 3/12/14.)  Mr. Field then admitted, "This is a
new matter for me.  I have significant anecdotal information from my client, but I do not
yet have financial documents.  Your request is reasonable and parallels the [sic] my
outstanding request for documents."  (Id.)  I also asked for a copy of his fee agreement
with the LLC.

EXHIBIT 4
Page 1 of 9

March 17, 2014
Page 2

The next day, Mr. Field seemed to change his tune, presumably after talking to Mr. Prentice. He wrote,

> "Your request raises interesting litigation issues which I, perhaps naively, hoped to avoid. By my analysis, your client's legal status is the subject of pending litigation. He may be the LLC's majority member and he may be a disassociated member or he may be something else. . . .

> "Perhaps, subject to client consent, we should agree that if I send you my letter of engagement:

>> (1)    This facilitation constitutes no waiver of attorney client privilege;
>> (2)    My letter of engagement will not be used as a litigation exhibit;
>> (3)    You will not call me as a deposition or courtroom witness in any litigation."

(Id. at 1, Email of 3/13/14.)

This exchange with Mr. Field is troubling for several reasons. First, once again, Dr. Bott is being treated as an outsider by the company's lawyer. Second, Mr. Prentice's gross mismanagement and breaches of fiduciary duty precipitated this litigation, and additional breaches of fiduciary duty during this lawsuit have harmed the company even more. Mr. Prentice had a conflict of interest when he hired The Law Office of Robert McGaughey and Markowitz, Herbold, Glade & Mehlhaf to represent the company. He also had a conflict of interest when he signed the agreement on the company's behalf agreeing that the company would pay for his legal fees as an individual defendant in this lawsuit. Because of those breaches of fiduciary duty, the company unnecessarily spent over $500,000 in legal fees. Any lawyer worth his salt that seeks to fix the company's financial difficulties in this situation ought to look first to Mr. Prentice and the company's disqualified lawyers for disgorgement of those fees.

Mr. Field, however, seems oblivious to Mr. Prentice's misconduct and conflicts of interest. He appears to have sided with Mr. Prentice already based upon "anecdotal information." He wrote, "By my analysis, your client's legal status is the subject of pending litigation. He may be the LLC's majority member and he may be a disassociated member or he may be something else." (Id.)

Third, Mr. Field seems ignorant of the Operating Agreement's terms. Under Section 4.2.3, Mr. Prentice, as Operating Manager, does not have any authority to "[s]ell, transfer, or exchange all or substantially all of the property owned by the Company,

EXHIBIT 4
Page 2 of 9

March 17, 2014
Page 3

provided, however, this shall not apply to sales in the ordinary course of business." (Ex 2 at 1, Excerpt of Operating Agreement.) In addition, under Section 8.1, dissolution requires either "consent of all of the Members" or "[b]y operation of law." (Id. at 2.)

Fourth, when the parties were last in front of you, on November 4, 2013, you directed the parties to work together to find replacement counsel for the LLC.

Mr. Prentice's overture to Mr. Field seems like another attempt to wrest control of this situation from this court, just like the writ of mandamus was. Now that the stay has lifted, the court should reassert control immediately.

You, I am sure, recall two years ago, in April 2012, at the start of this lawsuit, Dr. Bott asked for a receiver that would take Mr. Prentice's place and hopefully salvage the company from his gross mismanagement as part of Dr. Bott's Motion for a Temporary Restraining Order and Preliminary Injunction. Attempting to involve Mr. Field shows that Mr. Prentice now recognizes that someone else should step in. Unfortunately, Mr. Prentice has tainted Mr. Field's judgment in this situation. Dr. Bott agrees that the court should appoint a receiver, other than Mr. Field, and commence dissolution if the company is not salvageable based upon an impartial receiver's assessment.

Procedurally, Dr. Bott's Motion for a Temporary Restraining Order and for Preliminary Judgment is still pending. The court deferred ruling on it until it had more information about the company's financial condition and Mr. Prentice's gross mismanagement and disloyal conduct.

To address this situation, however, the LLC must have replacement counsel. As you know from Mike Layne's email on Friday, March 13, 2013, all counsel intend to have a telephone call on Tuesday at 1:30 p.m. to discuss candidates for that role.

Therefore, Dr. Bott requests that the following pending matters, and new matters, be scheduled as soon as possible:

1. <u>Status Conference Regarding Hiring New LLC Counsel.</u> Although some progress may be made towards this end by counsel on Tuesday, March 18, 2014, there will most likely be remaining logistical issues and concerns that require the court's guidance. The court should keep in mind, as alleged in paragraph 180 of Dr. Bott's Third Amended Answer, it has the power under ORCP 80 to appoint a receiver or custodian responsible for hiring LLC counsel, and that Dr. Bott requested an order of that nature as part of his Motion for a Temporary Restraining Order and Preliminary Injunction, and that the motion is pending still.

EXHIBIT 4
Page 3 of 9

March 17, 2014
Page 4

  2. <u>Motion for Receivership / with an additional request to place Eric Prentice on
     Administrative Leave</u>. Considering Mr. Field's emails, it appears Dr. Bott's
     motion for an order appointing a receiver has taken on a <u>new urgency</u> . Both
     of the LLC's owners, Dr. Bott and Mr. Prentice, now recognize a receiver is
     necessary to resolve potential insolvency issues, treatment of assets, and how
     the pending claims that the parties have against each other are treated in the
     context of a potential bankruptcy environment. We intend to present possible
     candidates for a receiver during the call with Mr. Layne on March 18, 2014
     and at the status conference.

  3. <u>Summary Judgment Motion Pertaining to the LLC's Claims Made Against
     Defendant Bott</u>. All submissions have been made on this motion, and we
     believe a hearing should be scheduled immediately after the LLC has a new
     lawyer.

  4. <u>Summary Judgment Motion Pertaining to Affirmative Defendants Asserted by
     the LLC</u>. Again, all submissions have been made on this motion, and we
     believe a hearing should be scheduled immediately after the LLC has a new
     lawyer.

Please have your law clerk or judicial assistant provide dates and times as soon as
possible for this status conference. Of note, I will be out of town on Friday, March 21,
2014, and only available in the morning on Thursday, March 20, 2014.


Sincerely,

Katherine R. Heekin

KH/jb
Encs.
41719

cc: Mike Layne, Esq. - w/encs.
      via email only / mlayne@laynelawoffice.com

EXHIBIT 4
Page 4 of 9

**From:** Joseph A. Field
**Sent:** Thursday, March 13, 2014 11:44 AM
**To:** 'Katherine Heekin'
**Cc:** Lawrence Vergun, Attorney at Law
**Subject:** Dr. Bott, LLC

Hi Katherine,

Your request raises interesting litigation issues which I, perhaps naively, hoped to avoid. By my analysis, your client's legal status is the subject of pending litigation. He may be the LLC's majority member and he may be a disassociated member or he may be something else. I prefer to stay out of these issues and to stay out of the parties' disputes and to let someone else resolve these issues to the extent necessary. At the same time, I very much want to work with you and your client on the company's insolvency issues and resolutions.

Perhaps, subject to client consent, we should agree that if I send you my letter of engagement:

1) This facilitation constitutes no waiver of attorney client privilege;
2) My letter of engagement will not be used as a litigation exhibit.
3) You will not call me as a deposition or courtroom witness in any litigation.

Alternatively, please let me know if you have another resolution to keep me out of the parties' litigation and acrimony while getting you the information you need to advise your client. The bottom line here is that I very much want to work with you and very much want to stay out of the parties' disputes. Thanks. -Joe

+++++++++++++++++++++++
Joseph A. Field
Field Jerger LLP
621 SW Morrison, Suite 1225
Portland, Oregon 97205
503.228 2665 (direct dial)
503.225.0276 (fax)
joe@fieldjerger.com

Visit us on the web at: www.fieldjerger.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

**From:** Katherine Heekin [mailto:Katherine@heekinmedeiros.com]
**Sent:** Thursday, March 13, 2014 11:12 AM
**To:** Joseph A. Field
**Cc:** Lawrence Vergun, Attorney at Law
**Subject:** RE: Dr. Bott, LLC

EX _____ 1

PAGE ___ 1 OF 3

EXHIBIT 4
Page 5 of 9

Joe,

Can you also send me a copy of the fee agreement that you have with the LLC?

Katherine

---

**From:** Joseph A. Field [mailto:Joe@fieldjerger.com]
**Sent:** Wednesday, March 12, 2014 5:31 PM
**To:** Katherine Heekin
**Cc:** Lawrence Vergun, Attorney at Law
**Subject:** Dr. Bott, LLC

Hi Katherine,

Thanks for your response. This is a new matter for me. I have significant anecdotal information from my client, but I do not yet have financial documents. Your request is reasonable and parallels the my outstanding request for documents. I will pass on your request to my client and forward the documents you seek to you before I call you. Can I give you a call early Friday afternoon? Thanks. -Joe

+++++++++++++++++++++
Joseph A. Field
Field Jerger LLP
621 SW Morrison, Suite 1225
Portland, Oregon 97205
503.228.2665 (direct dial)
503.225.0276 (fax)
joe@fieldjerger.com

Visit us on the web at: www.fieldjerger.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

---

**From:** Katherine Heekin [mailto:Katherine@heekinmedeiros.com]
**Sent:** Wednesday, March 12, 2014 4:39 PM
**To:** Joseph A. Field
**Cc:** Lawrence Vergun, Attorney at Law
**Subject:** RE: Dr. Bott, LLC

Joe,

I have been on the run all day and will be in a mediation tomorrow. What does Friday look like for you?

It would help me to understand the context for your email below if you send a copy of the current financial statements for the LLC and a list of Accounts Payable and a list of Accounts Receivable to me that I can review before we talk on Friday. Feel free to send anything else that you think is helpful to our discussion as well.

Katherine

EX _____ 1
PAGE ___ 2 OF 3

EXHIBIT 4
Page 6 of 9

**From:** Joseph A. Field [mailto:Joe@fieldjerger.com]
**Sent:** Tuesday, March 11, 2014 6:44 PM
**To:** Katherine Heekin
**Subject:** Dr. Bott, LLC

Dear Katherine,

Dr. Bott, LLC hired me to advise it on its current financial situation. I understand that Dr. Bott, LLC has increasing liabilities from its inability to pay its bills in full each month. I further understand that Dr. Bott, LLC and its two members are in litigation which has deadlocked the company. I would like to call you to report my preliminary thoughts and findings to you and to learn your thoughts. Please let me know if you will be available for me to call you sometime on Wednesday, 3/12/14. Thanks, Joe
+++++++++++++++++++++++++
Joseph A. Field
Field Jerger LLP
621 SW Morrison, Suite 1225
Portland, Oregon 97205
503.228 2665 (direct dial)
503.225.0276 (fax)
joe@fieldjerger.com

Visit us on the web at: www.fieldjerger.com

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.

Members, the Operating Manager does not have any authority to do any of the following (the "Major Decisions"):

4.2.1. Amend the Company's Articles of Organization or this Agreement;

4.2.2. Acquire any land or other real property or interest in land or other real property other than any easement, right-of-way, or other similar interest reasonably required, in the opinion of the Operating Manager, for the ownership or operation of the Company's Property;

4.2.3. Sell, transfer, or exchange all or substantially all of the property owned by the Company; provided, however, this shall not apply to sales in the ordinary course of business;

4.2.4. Execute any lease or other arrangement involving the rental, use, or occupancy of the Property or any part of it if such lease or other arrangement is for a net rentable area of more than 3,000 square feet or is for a term (including renewal options) in excess of five years; or

4.2.5. Construct any improvements or make any capital improvements, repairs, alterations, or changes in or to the Property involving in any instance an expenditure in excess of $10,000, except for matters expressly delegated to the Operating Manager by the Members.

4.3. Member's Exercise of Authority. Notwithstanding any other provision of this Agreement, should any Member who is not an Operating Manager exercise any right or power vested in the Member as a manager of the Company (other than voting or consenting to Major Decisions as provided in Section 4.2), on the approval of Members owning a majority of the Ownership Interests held by Members other than the breaching Member, the Company or such remaining Members have the option, but not the obligation, to purchase and acquire the interest of that Member in the Company for an amount equal to 60% of the amount that the Member otherwise would receive if the Company's assets were then sold and the proceeds distributed in liquidation to all Members in accordance with this Agreement. Payment for that Member's interest in the Company will be unsecured and will not be less than 20% of the purchase price at closing, and 20% of the purchase price on each anniversary of the closing until paid. This paragraph shall not apply to a transaction that does not hinder or restrict working capital and has the effect of increasing Company profits or cause assets of the Company to appreciate; such other Member shall not unreasonably withhold consent to such transaction.

4.4. Tax Matters Member. Eric W. Prentice is hereby designated and approved as Tax Matters Member for the Company; in such capacity, Eric W. Prentice is authorized to participate in any audit of the Company's federal income tax return, and in connection therewith, to negotiate, settle, and make agreements and adjustments with respect to the Company's federal

DR. BOTT LLC OPERATING AGREEMENT - 5

EX \_\_\_\_\_
PAGE 5 OF 18

EX \_\_\_\_\_
PAGE

EXHIBIT 4
Page 8 of 9

7.6.3.4. Responding Members cannot acquire the interests of other Responding Members who do no elect to participate in the acquisition of the Initiating Member's interest as the result of a Deadlock except in accordance with the provisions of this Section 7.6 wherein such purchasing Responding Member becomes an Initiating Member.

7.6.4. Closing shall take place on the 30th day after the expiration of the 60-day period provided in Section 7.6.2 for the giving of notice of election by the Responding Members or, if that 30th day shall fall on a weekend or a holiday, then on the next ensuing business day thereafter. The closing shall occur at a time and place in Portland, Oregon, to be designated by the purchasing Member. At the time and place of closing, the selling Member(s) shall convey, transfer, and assign to the purchasing Member(s) by assignment, bill of sale, and such other instruments of transfer as shall reasonably be required, all of the selling Members' rights and interests in and to the Company and all its assets, and shall, to the extent requested by the purchasing Member(s), cooperate to effect the smooth and efficient continuation of Company affairs.

7.6.5. The purchase price to be paid by the purchasing Member(s) to the selling Member(s) shall be equal to the amount that the selling Member(s) would have received if all of the Company's assets had been sold on the date of closing for a cash price equal to the Total Asset Value, and the proceeds thereof were applied and distributed in the manner provided in SECTION 8 of this Agreement, except that any reserves for contingencies shall not be taken into account for this purpose. The purchase price shall be payable in its entirety in cash, cashier's check, wire transfer, or certified funds (which funds shall be immediately available in Portland, Oregon) at closing.

## SECTION 8. DISSOLUTION AND WINDING UP OF THE COMPANY

8.1. Dissolution. The Company will be dissolved on the happening of any of the following events:

8.1.1. The consent of all of the Members to dissolve the Company; or

8.1.2. By operation of law.

8.2. Winding Up. On the dissolution of the Company, the Members must take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining their fair value, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to the liquidation, will be applied and distributed, after any gain or loss realized in connection with the liquidation has been allocated in accordance with SECTION 3 this Agreement, and the Members' Capital Accounts have been adjusted to reflect the allocation and all other transactions through the date of the distribution, in the following order:

DR. BOTT LLC OPERATING AGREEMENT - 14

*EP    RB*

X ___2___

PAGE _2_ OF _2_

EXHIBIT 4
Page 9 of 9

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2014 I electronically filed the foregoing DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR DEBTOR, DECLARATION OF TARA J. SCHLEICHER IN SUPPORT OF DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR DEBTOR AND DECLARATION OF KATHERINE HEEKIN IN SUPPORT OF DR. RODERICH BOTT'S OBJECTION TO APPLICATION TO EMPLOY FIELD JERGER, LLP AS COUNSEL FOR DEBTOR with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- CONDE T COX    ccox@lbblawyers.com, JQueener@lbblawyers.com
- JOSEPH A FIELD    joe@fieldjerger.com, koren@fieldjerger.com
- JUSTIN D LEONARD    jleonard@ml-llp.com, ecf@ml-llp.com;
  jleonard@pacernotice.com
- US Trustee, Portland    USTPRegion18.PL.ECF@usdoj.gov

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Dr. Bott LLC                          Eric Prentice
c/o Garvey Schubert Barer             9730 SW Hillman Ct #600
Attn: Gary I Grenley                  Wilsonville, OR 97070
121 SW Morrison St 11th Fl
Portland, OR 97204

Dated: June 12, 2014.

FARLEIGH WADA WITT

By: /s/ Tara J. Schleicher
     Tara J. Schleicher, OSB #954021
     (503) 228-6044
     tschleicher@fwwlaw.com
     Attorneys for Dr. Roderich Bott

Page  1 – CERTIFICATE OF SERVICE

*FARLEIGH WADA WITT*
Attorneys at Law
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741